IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MELVIN D. COLLINS, JR., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. H-06-1671 |
| | § | |
| MICHAEL J. ASTRUE, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| *Defendant.* | § | |

**MEMORANDUM AND ORDER**

Pending before the Court is Plaintiff Melvin D. Collins, Jr.'s, ("Collins") motion for

summary judgment and Defendant Michael J. Astrue's, Commissioner of the Social Security

Administration ("Commissioner"),[1] response to Collins' motion for summary judgment.  Collins

appeals the determination of an Administrative Law Judge ("ALJ") that he is not entitled to

receive Title II disability insurance benefits.  *See* 42 U.S.C. §§ 416(i), 423.  Having reviewed the

pending motions, the submissions of the parties, the pleadings, the administrative record, and the

applicable law, this Court is of the opinion that Collins' Motion for Summary Judgment (Docket

Entry No. 11) should be denied and the ALJ's decision denying benefits be affirmed.

**I.     _Background_**

On March 23, 2004, Collins filed an application for disability insurance benefits alleging

disability beginning on May 1, 2003, as a result of dizziness, right arm pain, and a herniated disc.

---

[1]  Michael J. Astrue was sworn in as Commissioner of Social Security on February 12, 2007.  Pursuant
to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should therefore be substituted
for Jo Anne B. Barnhart (former Commissioner) and Linda S. McMahon (interim acting Commissioner)
as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last
sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

(R. 28, 43-45).  After being denied benefits initially and on reconsideration, Collins requested an

administrative hearing before an ALJ.  (R. 24-28, 30-33, 34).

A hearing was held on June 13, 2005, in Raleigh, North Carolina,[2] at which time the ALJ

heard testimony from Collins and Byron Pettingill, a vocational expert (" VE").  (R. 254-275).

In a decision dated October 22, 2005, the ALJ denied Collins'  application for benefits.  (R. 13-

21).  On November 4, 2005, Collins appealed the ALJ' s decision to the Appeals Council of the

SSA' s Office of Hearings and Appeals.  (R. 9).  After considering new evidence submitted by

Collins, on March 17, 2006, the Appeals Council denied Collins'  request to review the ALJ' s

decision.  (R. 5-8).  This rendered the ALJ' s opinion the final decision of the Commissioner.

*See Sims v. Apfel*, 530 U.S. 103, 107 (2000).  Collins filed this case on May 16, 2006, seeking

judicial review of the Commissioner' s denial of his claim for benefits.  *See* Docket Entry No.

1.

II.    *Analysis*

A.    *Statutory Bases for Benefits*

Social Security disability insurance benefits are authorized by Title II of the Act and are

funded by Social Security taxes.  *See also* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY

HANDBOOK, § 2100.  The disability insurance program provides income to individuals who are

forced into involuntary, premature retirement, provided they are both *insured* and *disabled*,

regardless of indigence.  A claimant for disability insurance can collect benefits for up to twelve

---

[2]  The ALJ's decision cites the administrative hearing date as September 13, 2005, and its location as Houston,
Texas; however, the administrative hearing transcript indicates the hearing took place on June 13, 2005, in
Raleigh, North Carolina.  (R. 13, 256).

months of disability prior to the filing of an application.  *See* 20 C.F.R. §§ 404.131, 404.315; *Ortego v. Weinberger*, 516 F.2d 1005, 1007 n.1 (5th Cir. 1975); *see also Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir. 1997).

Applicants seeking benefits must prove " disability" within the meaning of the Act.  *See* 42 U.S.C. § 423(d); 20 C.F.R. § 404.1505(a).  Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  *See* 42 U.S.C. § 423(d)(1)(A).

B.      ***Standard of Review***

1.      ***Summary Judgment***

This Court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact.  The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party' s case.  If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is " material" only if its resolution could affect the outcome of the case. *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991).  When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party' s position.  *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000). If there are no issues of material fact, the court shall review any questions of law *de novo*.  *See*

3

*Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999). Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

### 2.   *Administrative Determination*

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d at 272; *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). The court may not, however, reweigh the evidence, try the issues *de novo*,

or substitute its judgment for that of the Commissioner.  *See Masterson*, 309 F.3d at 272.  In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve."  *Id.*

**C.**   ***ALJ's Determination***

An ALJ must engage in a five-step inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1.   An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.  *See* 20 C.F.R. § 404.1520(b).

2.   An individual who does not have a "severe impairment" will not be found to be disabled.  *See* 20 C.F.R. § 404.1520(c).

3.   An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.  *See* 20 C.F.R. § 404.1520(d).

4.   If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.  *See* 20 C.F.R. § 404.1520(e).

5.   If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  *See* 20 C.F.R. § 404.1520(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd*, 239 F.3d at 705.  The claimant has the burden to prove disability under the first four steps.  *See Myers*, 238 F.3d at 619.  If the claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  *See Masterson*, 309 F.3d at 272; *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995).  If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant

can perform in spite of his or her existing impairments, the burden shifts back to the claimant to prove that he or she cannot, in fact, perform the alternate work suggested.  *See Boyd*, 239 F.3d at 705.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *See id.*

The mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992).  An individual claiming disability benefits under the Act has the burden to prove that he suffers from a disability as defined by the Act.  *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  A claimant is deemed disabled under the Act only if he demonstrates an " inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A).  " Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for pay or profit.  *See Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. § 404.1572(a)-(b).

A medically determinable " physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3).  " [A]n individual is 'under a disability, only if his impairments are of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .' " *Greenspan*, 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)).  This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if he applied.  *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).

In the case at bar, when addressing the first four steps, the ALJ determined:

1. The claimant met the special earnings requirements of the Social Security Act on May 1, 2003, the date he stated he became disabled, and continued to meet them through the date of this decision.

2. The claimant has not engaged in substantial gainful work during the alleged onset date of disability.

3. The claimant has chronic pulmonary disease[3] with possible sarcoidosis,[4] degenerative disc disease,[5] obesity,[6] and sleep apnea,[7] but these

---

[3]  "Chronic obstructive pulmonary disease" ("COPD") is a disorder characterized by persistent or recurring obstruction of bronchial air flow, such as chronic bronchitis, asthma, or pulmonary emphysema.  *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 513 (29th ed. 2000).

[4]  "Sarcoidosis" is a chronic, progressive, systemic granulomatous reticulosis of unknown etiology, characterized by hard tubercles in almost any organ or tissue, including the lungs, lymph nodes, skin, liver, spleen, eyes, and small bones of the hands and feet.  *See* DORLAND'S, *supra*, at 1599.

[5]  "Degenerative disc disease" refers to a degeneration or deterioration, *see* DORLAND'S, *supra*, at 465, of the disc; which is a general term in anatomical nomenclature to designate the circular flat plates which extend from the axis to the sacrum, *see id.* at 510-511.

[6]  " Obesity" refers to an increase in body weight beyond the limitation of skeletal and physical requirement, as the result of an excessive accumulation of fat in the body.  *See* DORLAND' S, *supra*, at 1251.

[7]  "Sleep apnea" refers to transient periods of cessation of breathing during sleep.  It may result in hypoxemia and vasoconstriction of pulmonary arterioles, producing pulmonary arterial hypertension.  *See* DORLAND' S, *supra*, at 114.

impairments do not meet or equal in severity the requirements of any of the medical listings in Appendix 1, Subpart P, Regulations No. 4.

4.    The claimant's testimony was not fully credible or consistent with the record considered as a whole.

5.    The claimant has the residual functional capacity to lift and carry 10 pounds frequently and 20 pounds occasionally and alternate sitting and standing at will throughout an 8 hour workday.  He must work indoors in a clean air environment, and he cannot climb or work at heights or around moving or dangerous equipment.

6.    The claimant does not have the residual functional capacity to perform his past relevant work.

(R. 20-21).  As to the fifth step, the ALJ concluded:

8.    The claimant is 47 years of age, defined as a younger individual.

9.    The claimant has a limited education.

10.   The claimant does not have skills that readily transfer to jobs within his residual functional capacity.

11.   Based on the testimony of the vocational expert, and using Rule 202.18, Appendix 2, Subpart P, Regulations No. 4, as a framework for decision making, jobs that the claimant is able to perform exist in significant numbers in the national economy.   Examples of such jobs include hardware assembler, assembler (lawn and garden), and small products assembler.

12.   The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision.

(R. 21).  Because the ALJ found jobs that the claimant is able to perform exist in significant numbers in the national economy, a finding of "not disabled" was made.  (R. 20).

This Court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied.  *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619;

8

*Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. § 405(g), 1383(c)(3).

To determine whether the decision to deny Collins' claim for disability benefits is supported by substantial evidence, the court weighs the following four factors: (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the plaintiff's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the plaintiff's age, educational background, and work history. *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)). Any conflicts in the evidence are to be resolved by the ALJ and not the court. *See Newton*, 209 F.3d at 452; *Terrell*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

D.   *Issues Presented*

Collins contends that the ALJ's decision is not supported by substantial evidence. *See* Docket Entry No. 12. Specifically, Collins claims that the ALJ erred by failing to complete the analysis set forth in 20 C.F.R. § 404.1527(d)(2) before rejecting his treating physician's views. *See id.* Collins also claims that the Appeals Council failed to address new evidence in its decision as mandated by HALLEX § 1-3-501 and that the SSA failed to fulfill its obligation to send Collins' subsequent approval for benefits to the Appeals Council for reconsideration. *See id.* The Commissioner disagrees with Collins' contentions, maintaining that the ALJ's decision is supported by substantial evidence. *See* Docket Entry No. 14.

E.   *Review of the ALJ's Decision*

1.   *Objective Medical Evidence and Opinions of Physicians*

When assessing a claim for disability benefits, " [i]n the third step, the medical evidence of the claimant' s impairment is compared to a list of impairments presumed severe enough to preclude any gainful work." *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990).  If the claimant is not actually working and his impairments match or are equivalent to one of the listed impairments, he is presumed to be disabled and qualifies for benefits without further inquiry.  *See id.* at 532; *see also* 20 C.F.R. § 404.1520(d).  When a claimant has multiple impairments, the Act requires the Commissioner to " consider the combined effect of all of the individual' s impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B); *see Zebley*, 493 U.S. at 536 n.16; *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).  The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.  If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.  If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. § 404.1523; *see also Loza*, 219 F.3d at 393.  The ALJ must address the degree of impairment caused by the combination of physical and mental medical problems.  *See Gibson v. Heckler*, 779 F.2d 619, 623 (11th Cir. 1986) (citations omitted).  The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant' s most severe impairment.  *See Zebley*, 493 U.S. at 531.

The claimant has the burden to prove at step three that his impairment or combination of impairments matches or is equivalent to a listed impairment.  *See id.* at 530-31; *Selders*, 914 F.2d

10

at 619.   The listings are descriptions of various physical and mental illnesses and abnormalities,

most of which are categorized by the body system they affect.   *See Zebley*, 493 U.S. at 529-30.

Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory

test results.   *See id.* at 530.   For a claimant to demonstrate that his disorder matches an

Appendix 1 listing, it must meet all of the specified medical criteria.   *See id.*   An impairment that

manifests only some of those criteria, no matter how severely, does not qualify.   *See id.*

For a claimant to qualify for benefits by showing that his unlisted impairment, or

combination of impairments, is equivalent to a listed impairment, he must present medical findings

equal in severity to all the criteria for the one most similar listed impairment.   *See id.* at 531

(citing 20 C.F.R. § 416.926(a)).   A claimant's disability is equivalent to a listed impairment if

the medical findings are at least equal in severity and duration to the listed findings.   *See* 20

C.F.R. § 404.1526(a).   The applicable regulation further provides:

> (1)(i)  If you have an impairment that is described in the Listing of Impairments
> in Appendix 1 of Subpart P of this chapter, but—
>
> (A)  You do not exhibit one or more of the medical findings specified in the
> particular listing, or
>
> (B)  You exhibit all of the medical findings, but one or more of the findings is
> not as severe as specified in the listing;
>
> (ii)   We will nevertheless find that your impairment is medically equivalent to
> that listing if you have other medical findings related to your impairment that are
> at least of equal medical significance.

*Id.*   Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by

showing that the overall functional impact of his unlisted impairment or combination of

impairments is as severe as that of a listed impairment."   *Zebley*, 493 U.S. at 531.   Ultimately,

11

the question of equivalence is an issue reserved for the Commissioner.  *See Spellman v. Shalala*, 1 F.3d 257 (5th cir. 1993); 20 C.F.R. § 404.1527(e).

A review of the medical records submitted in connection with Collins' administrative hearing reveals that on March 18, 2003, Collins visited Linda C. Hyde, M.D. (" Dr. Hyde"). (R. 92).  Dr. Hyde assessed Collins to have bronchitis[8] and pharyngitis.[9]  (R. 92).  During a subsequent visit on September 30, 2003, Collins complained of vision problems and stomach pains, to which Dr. Hyde did not conclusively find a diagnosis.  (R. 91).  Dr. Hyde ordered an echocardiogram,[10] which was interpreted by Steven H. Farber, M.D. (" Dr. Farber") on October 3, 2003.  (R. 83-84).  Dr. Farber noted bilateral plaques evidencing hemodynamically significant disease.[11]  (R. 83-84).  On the same date, Collins was found to have a disc space narrowing and C5-6 degenerative disc disease.  (R. 85).

On October 14, 2003, Collins visited Dr. Hyde, complaining of blurred vision, nausea, and pain.  (R. 82).  Dr. Hyde ordered an MRI of Collins' spine and an eye exam.  (R. 82). Collins' MRI, dated October 17, 2003, revealed a left lateral disc bulging and spurring at C3-4;

---

[8] "Bronchitis" is the inflammation of the mucous membrane of the bronchial tubes.  *See* STEDMAN'S MEDICAL DICTIONARY 250 (27th ed. 2000).

[9] "Pharyngitis" is the imflammation of the throat with dryness and pain, especially on swallowing, followed by moisture of the pharynx, congestion of the mucous membrane, and fever.  *See* DORLAND'S, *supra*, at 1367.

[10] An "echocardiogram" is a record obtained from the use of ultrasound in the investigation of the heart and great vessels and diagnosis of cardiovascular lesions.  *See* STEDMAN'S, *supra*, at 563.

[11] "Hemodynamic" refers to the movements involved in the circulation of the blood.  *See* DORLAND'S, *supra*, at 802.

small right paracentral disk protrusion at C4-5; and a C5-6 right paracentral disk herniation,[12] to which Balbir Singh, M.D. (" Dr. Singh") reported " could encroach on the exiting nerve root." (R. 81).  Dr. Singh wrote to Dr. Hyde regarding the results of the MRI and a needle electromyography (" EMG")[13] evaluation on December 9, 2003.  (R. 94-95).  Dr. Singh reported Collins to have a history of neck pain and headache since 1991; to have a chief complaint of headaches with nausea, dizziness, and blurred vision; and who had surgery in his right arm and leg as well as hernia surgery.  (R. 94).  Dr. Singh also noted that the MRI revealed disc bulges at C3-4, C4-5, and C5-6 with a herniation at C5-6 which was causing Collins neural foraminal stenosis.[14]  (R. 95).  He believed Collins' dizziness was associated with his disc disease, and found Collins to have cervical radiculopathy[15] and unresponsive neck pain.  (R. 95).  Dr. Singh recommended Collins to see a pain specialist and to perform neck exercises.  (R. 95).  On

---

[12]  "Herniation" is the protrusion of the nucleus puposus or anulus fibrosus of an intervertebral disk, which may impinge on nerve roots.  *See* DORLAND'S, *supra*, at 814.

[13]  An "EMG" is an electrodiagnostic technique for recording the extracellular activity of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation.  *See* DORLAND'S, *supra*, at 576.

[14]  "Stenosis" is an abnormal narrowing of a duct or canal.  *See* DORLAND'S, *supra*, at 1698.

[15]  "Radiculopathy" is a disease of the nerve roots which often manifests as neck or shoulder pain.  *See* DORLAND'S, *supra*, at 1511.

December 11, 2003, in an echocardiography[16] report, Dr. Farber reported Collins to have an ejection fraction of 60%[17] and mitral valve prolapse.[18] (R. 99).

Collins underwent a physical residual functional capacity evaluation by Albert E. Ponterio, M.D. (" Dr. Ponterio") on April 27, 2004. (R. 105-112). Dr. Ponterio found Collins to have the ability to occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk for 6 hours in an 8-hour workday, sit for 6 hours in an 8-hour workday, and no limitations in his ability to push and/or pull. (R. 106). He found Collins to be limited in his ability to climb due to dizziness and to reach overhead. (R. 107-108). No visual, communicative, or environmental limitations were found, except that Collins was to avoid even moderate exposure to hazards such as machinery and heights due to dizziness. (108-109).

Through a referral from Dr. Hyde, Collins sought care due to shortness of breath from Arlene Marx, M.D. (" Dr. Marx"), on June 15, 2004. (R. 113). Dr. Marx made a differential diagnosis of " fluid overload (heart failure, renal failure, etc.), a pneumonia." (R. 113). On July 7, 2004, Collins visited with R. Stephen Grayson, D.O. (" Dr. Grayson"), complaining of coughing, burning chest area, vomiting, and body ache. (R. 124). Dr. Grayson found Collins to have pneumonia and noted " smoking" in the diagnosis. (R. 124).

---

[16] " Echocardiography" is a method of graphically recording the position and motion of the heart walls or the internal structures of the heart and neighboring tissue by the echo obtained from beams of ultrasonic waves directed through the chest wall. *See* DORLAND'S, *supra*, at 564.

[17] "Ejection" is the discharge of blood from the heart. *See* DORLAND'S, *supra*, at 572.

[18] "Mitral valve prolapse" ("MVP") is the redundancy or hooding of mitral valve leaflets so that they prolapse into the left atrium, often causing mitral regurgitation. *See* DORLAND'S, *supra*, at 1466. MVP is often asymptomatic but palpitations and chest discomfort may occur and in some cases progressive mitral regurgitation necessitates valve replacement. *See* DORLAND'S, *supra*, at 1761.

Robert Burress, M.D. ("Dr. Burress"), examined Collins' cough and chest pain on August 23, 2004. (R. 119). He assessed Collins to have chronic bronchitis, with abnormalities in the chest, and depression. (R. 118). Dr. Burress recommended that Collins visit a pulmonary doctor; he prescribed Advair;[19] and urged Collins to stop smoking, to which Collins refused. (R. 119). In a pulmonary function report, Dr. Burress noted a moderate obstruction to airflow with a moderately reduced FVC, evidenced by a post FVC of 2.66, pre of 2.57; and a post FEV1 of 2.04, pre of 1.90. (R. 120). Dr. Marx, at the request of Dr. Burress, examined Collins on August 27, 2004, and found an "appearance of congestive heart failure, with interstitial pulmonary edema. Blunting of the costophrenic angles may or may not represent pleural effusions."[20] (R. 115).

On August 31, 2004, Carlos E. Araujo, M.D. ("Dr. Araujo"), a pulmonologist, admitted Collins into a hospital due to "COPD [with] exacerbation" as well as having severe dyspnea.[21] (R. 196-197). Dr. Araujo noted Collins was a heavy smoker who had lost 25 pounds, experiencing shortness of breath with cough and sputum production. (R. 152). On September 1, 2004, Dr. Araujo performed tests and obtained the following results:

DEMOGRAPHICS: This is a 46-year-old Caucasian male, 67 inches height, 170 lb, smoker.

_____

[19] "Advair" is an inhaled medicine which has potent anti-inflammatory activity and an inhibitor of the release of histamine from the human lung. *See* PHYSICIANS' DESK REFERENCE 1291 (60th ed. 2006).

[20] "Pleural effusion" is the presence of fluid in the pleural space. *See* DORLAND'S, *supra*, at 570. The pleural space pertains to the serous membrane investing the lungs and lining of the thoracic cavity. *See* DORLAND'S, *supra*, at 1402.

[21] "Dyspnea" is breathlessnes or shortness of breath; difficult or labored breathing. *See* DORLAND'S, *supra*, at 558.

SPIROMETRY:  FEV-1 and FEC ration 76% with FEV-1 of 2.28 liters and [FVC] of 2.98 liters.
Lung volumes:  Total lung capacity 7.09 liters (115%). . . Impression:  Pre-bronchodilator trial does not meet American Thoracic Society (ATS) criteria for appropriate interpretation, suspect that airway obstruction based on flow time curve as well as hyperinflation and air trapping are detected that is nondiagnostic.  Repeat pulmonary function studies.

(R. 188).  Dr. Araujo also reported that his impressions were:

Mediastinal and bilateral hilar lymphadenopathy[22].  In addition, mild to moderate right pleural effusion is also noted.  This may represent granulomatous disease such as TB or fungal infection.  Other possibilities include[] sarcoidosis, primary or metastatic neoplasm.  Clinical correlation is recommended.

(R. 157).  A DLCO SB[23] also was performed at that time; Collins was found to have 39.9% lung capacity to diffuse carbon monoxide.  (R. 222).  Dr. Araujo made an initial assessment of State II-A chronic obstructive pulmonary disease, abnormal CT of the chest, hypokalemia,[24] and right pleural effusion.  (R. 153).  He recommended that Collins take supplemental oxygen, bronchodilators,[25] antibiotics, steroids, and to have a bronchoscopy.[26]  (R. 153).

---

[22]  "Lymphadenopathy" is disease of the lymph nodes.  See DORLAND'S, supra, at 1034.

[23]  " DLCO SB" stands for a measurement of the diffusing capacity of the lungs for carbon monoxide.  The measurement is used to establish the level of functional impairment in chronic pulmonary disease cases where other documentation does not show whether an impairment meets or is equivalent in severity to a listed impairment.  See 20 C.F.R. pt. 404, subpt. P, App. 1 § 3.00(F)(1).

[24]  " Hypokalemia" is the name for abnormally low potassium concentration in the blood which may result from excessive potassium loss by the renal or gastrointestinal route, from decreased intake, or from transcellular shifts.  See DORLAND'S, supra, at 864.

[25]  " Bronchodilators" cause an inrease in caliber of a bronchus or bronchial tube.  See STEDMAN'S, supra, at 251.

[26]  A " bronchoscopy" is an inspection of the interior of the trachobronchial tree for diagnostic purposes.  See STEDMAN'S, supra, at 251.

Dr. Araujo's discharge notes, dated September 4, 2004, reported a diagnosis of severe chronic obstructive pulmonary disease, hypoxemia,[27] mediastinal adenopathy,[28] hyperlipidemia,[29] and allergic rhinitis.[30]  (R. 149).  At that time, Dr. Araujo reported:

> Mr. Collins is a 46-year-old, heavy smoker admitted directly from my office for severe dyspnea on exertion and atypical chest pain.  The patient was found to have severe COPD with hypoxemia, air trapping, and hyperinflation.  He was treated with steroids, antibiotics and bronchodilators with partial results.  At the time of discharge, he will be going on Spiriva and Combivent p.r.n., as well as supplemental oxygen.  Five days of therapy are going to be prescribed.

(R. 149).  Dr. Araujo placed Collins on 2 liters nasal cannula supplemental oxygen to be taken continuously.  (R. 150).  Work-up studies revealed a "FEV1 of 2.28 liters (65% of predicted)" and a lung diffusion capacity of 40%.  (R. 149).

On September 9, 2004, on the referral of Dr. Araujo, Devinder S. Bathia, M.D. ("Dr. Bathia") evaluated Collins for mediastinal adenopathy.  (R. 143).  Dr. Bathia noted a CT scan of Collins' chest found him to have "mediastinal and bilateral hilar lymphadenopathy in addition to a mild to moderate right pleural effusion." (R. 143).  At that time, Dr. Bathia reported Collins

---

[27] "Hypoxemia" is the deficient oxygenation of the blood.  *See* DORLAND'S, *supra*, at 869.

[28] "Medistinal" pertains to the "mediastinum." *See* DORLAND'S, *supra*, at 1069. "Mediastinum" is the mass of tissues and organs separating the two pleural sacs.  It contains the heart and pericardium, the trachea and bronchi, the bases of the great vessels, esophagus, thymus, lymph nodes, thoracic duct, phrenic and vagus nerves, and other structures and tissues.  *Id.* at 1070.  Adenopathy is the enlargement of a lymph node, lymphadenopathy.  *Id.* at 30.

[29] "Hyperlipidemia" is a general term for elevated concentrations of any or all of the lipids in the plasma.  *See* DORLAND'S, *supra*, at 852.

[30] "Allergic rhinitis" is a general term used to denote any allergic reaction of the nasal mucosa; it may occur perennially or seasonally.  *See* DORLAND'S, *supra*, at 1572.

17

had quit smoking and that a mediastinoscopy[31] would be performed.  (R. 187).  On September 13,

2004, Dr. Bathia performed a mediastinoscopy; he gave a postoperative diagnosis of mediastinal

adenopathy and found abnormal lymph nodes, which he had biopsied.  (R. 168).  On September

16, 2004, Dr. Bathia wrote Dr. Araujo a progress note, which stated:

> I saw Mr. Collins in the office today. . . [h]is pathology report came back
> consistent with noncaseating granulomas with in the lymph nodes.  Most probably,
> this is sarcoid; however, there definitely was no evidence of any malignancy.

(R. 128).

On October 6, 2004, Collins visited Dr. Grayson who noted Collins to be under care of

Dr. Araujo and currently taking multiple inhalers.  (R. 122).  Collins' chief complaint was

pulmonary and Dr. Grayson reported a decreased FEV1, evidenced by a pulmonary function test,

that did not improve with Xopenex[32] treatment.  (R. 122).  Dr. Grayson further noted that:

" patient has understanding of nature of COPD.  If not good but all issues complicated by apparent

diagnosis of sarcoidosis.  Patient has multiple questions about disability." (R. 122).  He advised

Collins to continue to take Zoloft[33] because Collins extensively complained of anxiety and

prescribed Flonase,[34] Zyrtec,[35] and Xanax.[36]  (R. 122).

---

[31] " Mediastinoscopy" is an examination of the mediastinum by means of an endoscope permitting direct inspection and biopsy of tissue in the anterior superior mediastinum.  *See* DORLAND'S, *supra*, at 1069.

[32] "Xopenex" is indicated for the treatment or prevention of bronchospasm in adults, adolescents, and children 6 years of age and older with reversible obstructive airway disease.  *See* PHYSICIANS' DESK REFERENCE, *supra*, at 3144.

[33] "Zoloft" is indicated for the treatment of major depressive disorder in adults.  *See* PHYSICIANS' DESK REFERENCE, *supra*, at 2581.

[34] "Flonase" is indicated for the management of the nasal symptoms of seasonal and perennial allergic and nonallergic rhinitis in adults and pediatric patients 4 years of age and older.  *See* PHYSICIANS' DESK

On January 27, 2005, a clinical social worker with the Interfaith Employee Assistance Center, Karen McKibben (" McKibben"), forwarded family counseling records of Collins and his wife to his attorney' s case manager Maria Perez (" Perez"). [37] (R. 224, 236).  During the family counseling, Collins revealed that he felt depressed and that he had thoughts about hurting himself; however, no additional evaluations or diagnosis were provided in the record.  (R. 230-231).

On March 1, 2005, Collins visited Dr. Araujo for an evaluation.  (R. 220).  Dr. Araujo reported that Collins was using oxygen at night and Prednisone.[38]  (R. 220).  Dr. Araujo noted Collins' medical history as significant for COPD, sarcoidosis, hypoxemia, and obesity.  (R. 220).

On May 3, 2005, Collins had a follow-up visit with Dr. Araujo.  (R. 218).  Dr. Araujo once again listed COPD and sarcoidosis as ailments and added obstructive sleep apnea to his assessment.  (R. 218).  He recommended that Collins take more medications, including

---

REFERENCE, *supra*, at 1412.

[35]  "Zyrtec" is indicated for the relief of symptoms associated with seasonal allergic rhinitis due to allergens. *See* PHYSICIANS' DESK REFERENCE, *supra*, at 2589.

[36]  "Xanax" is indicated for the treatment of panic disorder.  *See* PHYSICIANS' DESK REFERENCE, *supra*, at 2655.

[37]  The treatment notes appear to list Collins' wife, Kathy Collins, as the client.  (R. 225-228).

[38]  "Prednisolone" is a corticosteroid indicated for steroid-responsive inflammatory ocular conditions.  *See* PHYSICIANS' DESK REFERENCE, *supra*, at 564.

Budesonide,[39] Xopenex, Zoloft, Restoril,[40] Albuterol MDI,[41] 2 liters of oxygen, as well as to continue taking Prednisone, and to participate in a sleep study.  (R. 219).

On May 22, 2005, Collins underwent a sleep evaluation at Dr. Araujo' s request, at which time it was found he had significant difficulties sleeping due to apnea.  (R. 212).  W. David Brown, Ph.D. (" Dr. Brown") noted that Collins' sleep quality was only fair with treatment (Nasal CPAP); however, the treatment helped the breathing abnormalities that Collins experienced during sleep.  (R. 212).  Dr. Brown diagnosed Collins with obstructive sleep apnea (resolved with CPAP[42] at 9 cm H2O) and periodic limb movement syndrome.[43]  (R. 211).  Dr. Brown noted Collins was currently being treated with Zoloft, Temazepam (Restoril), Benadril, breathing treatments, and supplemental oxygen at 2 liters per minute.  (R. 211).

On June 14, 2005, a second sleep evaluation was performed and Collins was once again diagnosed with obstructive sleep apnea and periodic limb movement syndrome.  (R. 208).  Dr. Brown noted Collins to be taking the same medications he had in the previous month.  (R. 208).

---

[39]  "Budesonide" is indicated for the treatment of asthma and management of nasal symptoms of seasonal or perennial allergic rhinitis.  *See* PHYSICIANS' DESK REFERENCE, *supra*, at 654-658.

[40]  "Restoril (Temazapan)" is used as a sedative in the treatment of insomnia.  *See* DORLAND'S, *supra*, at 1796.

[41]  "Albuterol (Combivent)" is an inhalation aerosol indicated for use in patients with chronic obstructive pulmonary disease on a regular aerosol bronchodilator who continue to have evidence of bronchospasm and who require a second bronchodilator.  *See* PHYSICIANS' DESK REFERENCE, *supra*, at 879.

[42]  "CPAP" stands for continuous positive airway pressure.  *See* DORLAND'S, *supra*, at 415.

[43]  "Periodic Limb Movement Syndrome" is also called "periodic limb movement disorder" and" nocturnal myoclonus."  *See* DORLAND'S, *supra*, at 531.  "Nocturnal myoclonus" refers to nonpathological myoclonic jerks of the limbs occurring as a person is falling asleep or is asleep; in the latter case they may disrupt sleep. *See id.* at 1169.

During this visit, Dr. Brown reported that Collins' sleep quality was fairly poor and that Collins had severe enough apnea to warrant a trial of nasal CPAP.  (R. 209).

On June 21, 2005, Dr. Araujo noted Collins to have COPD, sarcoidosis, obstructive sleep apnea corrected with CPAP, and periodic limb movement syndrome.  (R. 214).  In a list of recommendations, Dr. Araujo listed Klonopin/clonazepam;[44] CPAP; and 2 liters of supplemental oxygen with exercise and at night as part of Collins' care plan.  (R. 215).  At that time, Dr. Araujo also completed Collins' physical residual functional capacity questionnaire.  (R. 232). Dr. Araujo reported he had been Collins' physician since August 31, 2004, and he was in contact with Collins every one to two months.  (R. 232).  He diagnosed Collins with sarcoidosis, COPD, and obstructive sleep apnea evidenced by abnormal CT scan of the chest and a biopsy indicating sarcoidosis.  (R. 232).  Dr. Araujo opined that Collins was unable to work due to many physical limitations, based on Collins' respiratory impairment and his need for oxygen.  (R. 232-235). He further noted Collins to have depression but did not believe that the emotional impairments Collins suffered affected his functional limitations.  (R. 233).  On June 23, 2005, Collins underwent another spirometry and DLCO.  (R. 216).  At that time, his FEV1 was at 1.66 (pre), 1.84 (post) and DLCO SB was at 45.1%.  (R. 216).

" [O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).  The opinion of a

---

[44]  "Klonopin (Clonazepam)" is used in the treatment of petit mal seizures and panic disorder without agoraphobia. *See* PHYSICIANS' DESK REFERENCE, *supra*, at 2782.

21

specialist generally is accorded greater weight *than* that of a non-specialist.  *See Newton*, 209 F.3d at 455; *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994), *overruled on other grounds by Sims v. Apfel*, 530 U.S. 103, 108 (2000).   Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory findings.  *See Scott*, 770 F.2d at 485.  Moreover, a treating physician's opinions are far from conclusive and may be assigned little or no weight when good cause is shown.  *See Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*, 38 F.3d at 237.   Good cause may permit an ALJ to discount the weight of a treating physician's opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.  *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456; *see also Brown*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul*, 29 F.3d at 211.   It is well settled that even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status.  *See Paul*, 29 F.3d at 211; *accord Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

In the case at bar, based on the objective medical facts and opinions of physicians, there is substantial evidence in the record to support the ALJ's determination that Collins suffered from impairments which did not meet or equal the requirements of a Listing in Appendix 1 from May 1, 2003, through the date of the hearing.  Although Collins argues that the ALJ should have found that his COPD met or equaled the criteria of Listing 3.02,[45] this assertion is not supported by the

---

[45]  The listing provides that an individual suffers from a chronic pulmonary insufficiency if he meets any of the following criteria:

record.  The medical records clearly document that Collins was able to achieve FEV1s of 2.04, 2.28, and 1.84 during pulmonary function testing performed on March 2004, September 1, 2004, and June 23, 2005, respectively.  (R. 120, 216, 222).  Based on Collins' height of 67 inches, Section 3.02(A) would require an FEV1 equal to or less than 1.35 to meet the Listing.  (R. 216, 222); 20 C.F.R. Subpt. P. App. 1, Listing 3.02.

Additionally, contrary to Collins' contention, the record did not show continuous supplemental oxygen use since September 2004.  Dr. Araujo noted in progress notes dated March 1, 2005, and June 21, 2005, that Collins should take supplemental oxygen at night and during exercise.  (R. 214, 220).  Because Dr. Araujo's only recommendation for continuous supplemental oxygen was during Collins' hospitalization on September 1, 2004, no further continuous use is supported by the record.  (R. 150, 214, 220).

Moreover, the ALJ did not err in finding Collins did not meet any other section of Listing 3.02 because Collins only met the criteria of Listing 3.02(C) in August 31, 2004, as evidenced by a DLCO SB of 39.9%, before starting supplemental oxygen at night.  (R. 149).  After starting

---

A.     Chronic obstructive pulmonary disease, due to any cause, with the FEV equal to or less than the values specified in table I corresponding to the person's height without shoes [ ][(Table I lists the FEV1 value as 1.35 for a person of 66-67 inches of height)]; Or

B.     Chronic restrictive ventilatory disease, due to any cause, with the FVC equal to or less than the values specified in Table II corresponding to the person's height without shoes [ ] [(Table II lists the FVC value as 1.55 for an individual of 66-67 inches of height)]; Or

C.     Chronic impairment of gas exchange due to clinically documented pulmonary disease. With:

1.     Single breath DLCO (see 3.00F1) less than 10.5 ml/min/mm Hg or less than 40 percent of the predicted normal value . . . .

20 C.F.R. Subpt. P, App. 1, Listing 3.02.

supplemental oxygen at night, Collins' single breath DLCO was not less than 40% of predicted levels. (R. 216). It is well settled that an impairment which can be controlled with medication is not disabling; thus, the ALJ correctly assessed Collins did not meet Listing 3.02(C). *See Glenn v. Barnhart*, 124 Fed. Appx. 828, 829 (5th Cir. 2005) (citing *Johnson v. Bowen*, 864 F.2d 340, 347 (5th Cir. 1988); *Fraga v. Bowen*, 810 F.2d 1296, 1303-04 (5th Cir. 1987); *Adams v. Bowen*, 833 F.2d 509, 511-12 (5th Cir. 1987)).

Finally, to the extent Collins argues that the ALJ improperly rejected his treating physician's opinion, this argument is without merit. In his decision, the ALJ set forth a detailed chronology of Dr. Araujo's treatment of Collins. (R. 17-18). The ALJ further explained, in compliance § 404.1527(d)(2), the basis for not giving Dr. Araujo's assessment controlling weight. (R. 18). Because Dr. Araujo's assessment conflicted with the objective evidence in the medical record, the ALJ's finding in this regard is supported by substantial evidence.

Taking into consideration all of these factors, substantial evidence clearly supports the ALJ's decision that Collins' impairments do not meet or equal the criteria in an Appendix 1 Listing.

## 2. *Subjective Complaints*

The law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints. *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981)). When a plaintiff alleges disability resulting from pain, he must establish a medically determinable impairment that is capable of producing disabling pain. *See Ripley v. Chater*, 67 F.3d 552, 556 (5th Cir. 1995) (citing 20 C.F.R. § 404.1529). Once a medical impairment is established, the subjective complaints of pain must

24

be considered along with the medical evidence in determining the individual's work capacity. *See id.*

It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference. *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott v. Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128. The Fifth Circuit recognizes that "the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand. *See Falco*, 27 F.3d at 164 n.18. Moreover, "[t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings." *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522 (citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir. 1986).

As a matter of law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability. *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986). Additionally, the mere existence of pain does not automatically bring a finding of disability. *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281. It must be determined whether substantial evidence indicates an applicant can work despite being in pain or discomfort. *See Chambliss*, 269 F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir. 1985).

For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly unresponsive to therapeutic treatment." *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128.   The decision arising from the ALJ's discretion to determine whether pain is disabling is entitled to considerable deference.  *See Chambliss*, 269 F.3d at 522; *Wren*, 925 F.2d at 128; *James*, 793 F.2d at 706.   However, an ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record.  *See Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

At the administrative hearing, Collins testified regarding his complaints of pain and dizziness.  (R. 254-275).  The ALJ's decision indicates that the ALJ did consider objective and subjective factors related to the severity of Collins' subjective complaints.  (R. 13-21).   In reaching his determination in this regard, the ALJ concluded:

> Due consideration has been given to credibility, motivation, the objective medical evidence and opinion, clinical and laboratory findings, diagnostic tests, the extent of medical treatment and relief from medication and therapy, the claimant's daily activities, the extent, frequency, and duration of symptoms, attempts to seek relief from symptoms, the claimant's earnings record, and all of the evidence of record considered as a whole.  The undersigned Judge finds that the claimant's subjective symptoms are of only a mild to moderate degree and tolerable for the level fo work, residual functional capacity and work limitation as found herein; and the claimant's subjective complaints are found not to be fully credible but somewhat exaggerated.

(R. 19).

Here, the ALJ's credibility findings are supported by the evidence in the record.  The records reflect that Collins did suffer pain from a herniated disc; however, he testified that the pain is severe if he does not take "pain pills."  (R. 269).  Collins' back pain appears to be controlled with medication.  (R. 269).  Additionally, Collins testified that he had problems taking

26

care of his personal needs and that he could walk 50 feet without supplemental oxygen; however, he also testified that he likes to go outside in the morning and "do cat fishing." (R. 267-269). Collins further testified that he was able to cook and drive on occasion but that he did not do housework except when necessary and that those instances consisted of him supervising his children. (R. 267-268). Collins stated that he was able to lift a gallon of milk and carry a diaper bag. (R. 266). Collins also indicated that he was able to stand for 20 or 30 minutes, and stated that he hated to sit but did not indicate that he was unable to do so for a long period of time. (R. 266).

The Court does not doubt that Collins suffers from pain; however, the records do not support a finding that Collins' pain is constant, unremitting, and wholly unresponsive to therapeutic treatment. *See Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128. As such, the ALJ's conclusion that Collins' alleged limitations and symptoms were not wholly credible is supported by substantial evidence.

### 3.   *Residual Functional Capacity*

Under the Act, a person is considered disabled:

> . . . only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . .

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). The Commissioner bears the burden of proving that a claimant's functional capacity, age, education, and work experience allow him to perform work in the national economy. *See Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *see also*

*Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236. If the Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that he cannot perform the alternate work suggested. *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

To determine whether a claimant can return to a former job, the claimant's "residual functional capacity" must be assessed. *See Moore v. Sullivan*, 895 F.2d 1065, 1068 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545. This term of art merely represents an individual's ability to perform activities despite the limitations imposed by an impairment. *See Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990); *see also* 20 C.F.R. §§ 404.1545, 416.945. Residual functional capacity combines a medical assessment with the descriptions by physicians, the claimant or others of any limitations on the claimant's ability to work. *See Elzy v. Railroad Retirement Bd.*, 782 F.2d 1223, 1225 (5th Cir. 1986); *see also* 20 C.F.R. §§ 404.1545, 416.945. When a claimant's residual functional capacity is not sufficient to permit him to continue his former work, then his age, education, and work experience must be considered in evaluating whether he is capable of performing any other work. *See Boyd*, 239 F.3d at 705; 20 C.F.R. §§ 404.1520, 416.920. The testimony of a vocational expert is valuable in this regard, as "[he] is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986); *accord Carey*, 230 F.3d at 145; *see also Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995).

In evaluating a claimant's residual functional capacity, the Fifth Circuit has looked to SSA rulings ("SSR"). *See Myers*, 238 F.3d at 620. The Social Security Administration's rulings are

not binding on this court, but they may be consulted when the statute at issue provides little guidance. *See id.* In *Myers*, the Fifth Circuit relied on SSRs addressing residual functional capacity and exertional capacity. *See id.* In that case, the court explained:

> First, SSR 96-8p provides that a residual functional capacity (RFC) is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule. The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work. . . . RFC involves both exertional and non-exertional factors. Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately. In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. . . . The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34474-01 (July 2, 1996). The court further commented:

> Second, SSR 96-9p also provides that initially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities. . . . The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50. Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34478 (July 2, 1996). The court also noted that SSR 96-9p defines "exertional capacity" as the aforementioned seven strength demands and requires that the individual's capacity to do them on a regular continuing basis be stated. *See id.* To determine that an claimant can do a given type of work, the ALJ must find that the claimant

29

can meet the job's exertional requirements on a sustained basis.  *See Carter v. Heckler*, 712 F.2d 137, 142 (5th Cir. 1983) (citing *Dubose v. Matthews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

In the case at the bar, the VE testified that Collins is no longer able to perform his past relevant work as all of Collins' six occupations were skilled and performed at the medium or very heavy level of exertion.  (R. 271-272).  Based on Collins' age, education, work experience, and RFC, the VE testified that Collins would be able to perform light work that existed in significant numbers in the national economy.  (R. 272).  The VE stated that the alternative work available included small products assembler, hardware assembler, and lawn and garden equipment assembler.  (R. 272).          Collins contends the ALJ erred by failing to take into account the VE's response that a person using supplemental oxygen would not be accommodated by employers.  *See* Docket Entry No. 12.  The record, however, did not support such a hypothetical; the record indicated Collins' supplemental oxygen use occurred only at night and during periods of exertion.  (R. 215, 220).

As such, taken as a whole, there is sufficient evidence in the record to support the ALJ's conclusion that Collins was capable of performing a significant number of light jobs available in the national and local economies.  *See Carey*, 230 F.3d at 147.  In short, the bulk of the evidence before the ALJ, when proper legal standards are applied, reflects that Collins was capable of engaging in substantial gainful activity, precluding a finding of disability within the parameters of the Act.  *See Masterson*, 309 F.3d at 273; *Brown*, 192 F.3d at 496-98; *Greenspan*, 38 F.3d at 236; *Falco*, 27 F.3d at 162-64; *Wren*, 925 F.2d at 128; *Selders*, 914 F.2d at 618-20. Accordingly, there is substantial evidence in the record to support the ALJ's finding that Collins was not disabled as that term is defined under the Act.

F.     _**Additional Evidence**_

Collins contends the Appeals Council indicated in its decision that it considered evidence which was not incorporated into the transcript.  *See* Docket Entry No. 12.  " The Hearings, Appeals and Litigation Law Manual (" HALLEX") Section I-3-501 (Nov. 11, 1994), provides that the Appeals Council must 'specifically address additional evidence' . . . submitted in connection with the request for review."  *See Newton*, 209 F.3d at 459.  Collins argues the new evidence shows the ALJ misconstrued his need for supplemental oxygen to be required only at night.  *See* Docket Entry No. 12.

The regulations provide that the Appeals Council will consider evidence if it is new and material and relates to the period on or before the date of the ALJ' s decision.  *See* 20 C.F.R. §§ 404.970(b), 404.976(b)(1).  If a claimant submits evidence that does not relate to the relevant time period, the Appeals Council returns it to the claimant.  *See* 20 C.F.R. § 404.976(b)(1). Because Dr. Araujo' s report was outside the relevant time frame under consideration, the Appeals Council correctly excluded it from consideration.  (R. 5-8).  Here, the Appeals Council considered the additional evidence and determined that it did not provide a basis for changing the ALJ' s decision.  (R. 5-6).  Indeed, the new evidence only indicated continuous oxygen use during his September 2004 hospitalization.  (R. 242-253).  Because the Appeals Council specifically addressed Collins'  additional evidence submitted in connection with his request for review, the Appeals Council did not violate HALLEX section I-3-501.

Next, Collins contends that his subsequent approval for disabilities should have been considered by the Appeals Council for a determination if such approval contained new and material evidence relating to the period on or before the ALJ' s decision.  *See* Docket Entry No.

31

12.  Collins began receiving disability benefits in November 2005 due to a hospitalization and subsequent use of continuous supplemental oxygen.  *See* Docket Entry No. 12.  His argument is moot as the ALJ's decision took place on October 2005.  (R. 10-21).  Accordingly, as the new evidence is not relevant to the time period on or before the ALJ, it was correctly excluded for consideration by the Appeals Council.

III.    ***CONCLUSION***

Accordingly, it is therefore

**ORDERED** that Collins' Motion for Summary Judgment (Docket Entry No. 11) is **DENIED**.  It is further

**ORDERED** that the Commissioner's decision denying Collins disability benefits is **AFFIRMED**.

**SIGNED** at Houston, Texas on this the 16th day of April, 2007.

Calvin Botley
United States Magistrate Judge

32